# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANNA SCHOENBACH, *et al.*,

Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.*,

Defendants.

C.A. No. 02-CV-2034 (HHK)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs respectfully request that this Court enter summary judgment in their favor.  The grounds for this motion appear in the accompanying memorandum of points and authorities.

WHEREFORE, plaintiffs respectfully request that this motion be granted.

Respectfully submitted,

_/s/ (filed electronically)_
Michael J. Eig            #912733

_/s/ (filed electronically)_
Haylie M. Iseman        #471891

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Anna Schoenbach and her parents

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANNA SCHOENBACH, *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 02-CV-2034 (HHK) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS'  MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION.**

Anna Schoenbach ("Anna") is an eleven-year-old student with educational disabilities,

who is entitled under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400

*et seq.*, to receive special education and related services from defendants, the District of

Columbia Public Schools ("DCPS" or "the school system").  Anna and her parents, Andrew

Schoenbach and Daryl Kade (collectively "the parents" or "the Schoenbachs") brought this action

in response to the defendants' failure to provide Anna with the free appropriate public education

("FAPE") and due process of law to which she is entitled under the IDEA.

This is a relatively simple case, only complicated by the school system's failures to do as

the IDEA requires by providing necessary special education services to Anna.  The school system

has thus violated this family's rights, procedurally and substantively.

Through an administrative appeal, the parents sought the remedy of a non-public

placement in which Anna could receive all of her special education services in an appropriate

small class setting.  This action is an appeal of the Hearing Officer's decision, denying that request.

The Hearing Officer determined, against the clear weight of the law and the evidence, that although DCPS did not meet its burden of proving that it had offered Anna an appropriate program and placement, nor implemented the promised measures that are so critical to her success, DCPS was *still* not required to give the parents the relief they requested: placement and funding of Anna at Kingsbury Day School ("Kingsbury") for the 2002-03 school year.  What is most critical in all of this is that the school system experts, themselves, have never been able to testify that DCPS offered Anna an appropriate education.  Though the parents appealed the appropriateness of the proposed Individualized Education Program ("IEP"), the school system witnesses never addressed the goals, objectives or services contained in the IEP, much less demonstrated that the IEP was appropriate to meet Anna's complex needs.  Yet, ignoring the undisputed and unrebutted testimony of the parents' expert witnesses, and severely misallocating the burden of proof, the Hearing Officer found that DCPS did not deny Anna a FAPE.  He therefore did not order DCPS to fund Anna's placement at Kingsbury.

As there are no material facts in dispute and plaintiffs are entitled to judgment as a matter of law, plaintiffs respectfully request that this Court enter summary judgment and provide them with the much-delayed relief to which they are entitled.

## II.    FACTUAL BACKGROUND.

In addition to the Statement of Facts material to the disposition of this motion for summary judgment, submitted pursuant to Local Rule 7.1(h), plaintiffs hereby summarize the facts of this case.

### A.    Educational History.

Anna Schoenbach is an exceptionally bright eleven-year-old child with a very

complicated educational profile.  She is eligible for special education and related services under

the IDEA as a student with Asperger's Syndrome (a high-functioning Autism-spectrum disorder),

and Attention Deficit Hyperactivity Disorder, inattentive type ("ADHD").  Bates Label 10.

However, these disabilities comprise only the tip of the iceberg.  Where autism is marked by a

"severe and sustained impairment of social relations, and [the] development of restrictive,

repetitive patterns of behavior", as well as disorders in communication, Asperger's Syndrome

combines these symptoms with a high cognitive ability.  Tr. at 117.  So, though Anna's testing

reveals that she is of "superior" intelligence, Bates Label 113, she has faced a number of

obstacles to her learning.  In school last year, Anna experienced great emotional distress, much of

it stemming from her anxiety over not being able to learn in the public school setting – and being

intelligent enough to *understand* that she is not learning – and therefore feeling a sense of

incompetence, different and alienated from her peers.  However, she is unable to express her

anxiety and frustration appropriately, and cannot communicate her feelings in a manner that is

acceptable in the classroom.  Because all of these disabilities unquestionably have a great impact

on Anna's ability to learn, the experts who have evaluated her recommend that she receive

special education and related services in a small, highly structured setting that can address both

her learning deficits and her giftedness.  Bates Label 90.

Anna attended her neighborhood public school, Murch Elementary School ("Murch"),

from Kindergarten through the end of the 2001-02 school year, when she completed fifth grade.

Complaint ¶7; Answer ¶7.  For the majority of this time, she did not receive any special

education or related services under the IDEA. The school system first identified Anna's disabilities at the end of her third grade year, but at that time did not consider her eligible for IDEA services. Instead, DCPS provided her with a Section 504 Plan, which allowed her some accommodations within the general education classroom. Complaint ¶8; Answer ¶8.

Unfortunately, the 504 Plan proved insufficient, as Anna still struggled with the social-emotional aspects of her Asperger's Disorder, in addition to difficulties in math, writing, extreme disorganization, and a basic understanding of subject matter and assignments. Emotionally, she was unable to cope; she faced "extensive teasing and bullying" at school, began "com[ing] home very stressed," and started to "hate[] to go to school." Tr. at 75, 78. Her grades remained acceptable, but this limited success was largely attributable to the hours of homework she was doing each night with her parents, Tr. at 103-07, as well as the private services that her parents had secured outside of school: tutoring in math and in language arts, occupational therapy, and speech/language therapy. Tr. at 81, 83-84. In her father's words, "The school has been terrific[, however] it is not because of the school that she does so well; but it is in fact because of all the efforts we've been able to put in." Tr. at 81.

Over the next year, even *with* the 504 Plan, Anna still was not able to make progress in her areas of need. "Unfortunately, the language and math tutors were not successful . . . because we were unable to integrate those tutorings with the school experience. And so it became an added workload [f]or Anna, and she just – It was too much for her." Tr. at 85. While she was able to keep pace academically with her classmates, as would be expected, given her superior intelligence, it was clear to all of her educators and her parents that she required a higher degree of service. Tr. at 31-32. The IEP team's eventual determination that Anna was eligible for

special education services – at this point, still months away – demonstrates that the parents and

Murch educators believed that some component was missing from Anna's educational program.

The Schoenbachs were determined to identify whatever educational needs that school system had

overlooked, and advised Murch that they were going to obtain an outside evaluation.  Tr. at 75,

98.

They made arrangements to have Anna independently evaluated by psychologists Dr.

Terry Edelstein and Dr. Lynnwood B. Andrews.  In October, 2001, these experts completed a

comprehensive psychological evaluation of both cognitive and educational functioning and made

specific programming recommendations.  Bates Label 88-115.  This independent evaluation

revealed additional learning issues, and evidenced that the school system was not providing Anna

with all of the services she required, nor addressing all of her needs.

When the written report was complete, the parents provided it to DCPS for review.

Complaint ¶11; Answer ¶11.  Realizing from the advice of these experts that Anna required more

support, the Schoenbachs again requested that Anna receive special education and related

services.  In response to the parents' requests, on or about February 15, 2002, a DCPS

psychologist completed a written review of the outside psychological evaluation, and did not

dispute any of Drs. Edelstein and Andrews' findings or recommendations.  Bates Label 69-72.

> **B.**     **The School System's Determination of Anna's Eligibility for Special Education.**

On February 19, 2002, during Anna's fifth grade year, DCPS convened a

Multidisciplinary Team ("MDT") meeting to determine whether Anna was eligible for special

education services.  After some discussion, the meeting was tabled to reconvene after DCPS had

the opportunity to complete other evaluations of Anna: a speech/language evaluation and an

occupational therapy assessment.  Complaint ¶14; Answer ¶14.  However, despite this

agreement, DCPS later proposed to reconvene the MDT meeting to determine Anna's eligibility

on March 26, 2002, even though the occupational therapy assessment was not yet compete.

Complaint ¶15; Answer ¶15.

 Finally, at the meeting on March 26, 2002, DCPS determined that Anna was eligible for

special education services, as a student with Autism and ADHD.  Complaint ¶16; Answer ¶16.

At that meeting, DCPS developed an Individualized Education Program ("IEP") for Anna,

proposing to provide her with one hour per week of "Specialized Instruction" in a resource

room,[1] and thirty minutes per week of "Social Work" services, also removed from the classroom.

Under this IEP, Anna would spend less than five percent of her school week in special education,

and the remainder in the general education environment with 1:1 special education support. Bates

Label 10; Tr. at 57-59.  DCPS proposed to implement the IEP by continuing Anna's placement at

Murch Elementary.  Bates Labels 19 (in box titled "Location of Services"), 21 and 22.

 The March 26, 2002, IEP team specifically determined that Anna needed to be assigned a

1:1 dedicated aide for all of her academic subjects.  The DCPS clinical psychologist, Dr. Ray

Adomaitis, recommended that this aide be "well-versed with the specifics of Asperger's

Syndrome."  Complaint ¶21; Answer ¶21; Bates Label 144 (notes from the March 26, 2002 IEP

Meeting).

 Because the team did not have a recommendation from the DCPS occupational therapist,

the proposed IEP did not include any occupational therapy goals, objectives, or service.

---

[1] This hour was to be devoted solely to "Organizational Skills."  Tr. at 58.  The IEP
provided for Anna to work on all of her academic subjects in the regular education classroom.

Complaint ¶18; Answer ¶18.  The parents did not receive the completed occupational therapy assessment until June 13, 2002, *after* the IEP was completed.  Tr. at 88.  Additionally, though the parents requested that DCPS explore Anna's diagnosed sensory integration issues, the school system was unable to do so, and so never evaluated these issues.  Tr. at 54-56; Bates Label 25-26.

The Schoenbachs were concerned that the IEP was failing to address a number of Anna's critical areas of need, and that the services proposed were insufficient and inadequate for her.  However, it was also very late in the school year, and they recognized that she needed some special education services in place.  By letter dated April 4, 2002, they advised DCPS of their concerns with the IEP.  Complaint ¶19; Answer ¶19; Tr. at 90, 92; Bates Label 132.  They specifically advised DCPS that they believed that the IEP was missing some critical services:

> Key recommended services in the assessment [by Drs. Edelstein and Andrews] included: small group instruction available daily across all subject areas, staff knowledgeable about children with severe social disabilities, training integrated into the wider curriculum, small structured and supervised activity groups, and an individualized education plan that allows Anna to practice new skills and demonstrate her competency within the confines of her limited range of interests – in summary, a "coordinated social, communications, and adaptive skills curriculum and behavior management approach."

Bates Label 132.  The Schoenbachs did sign the IEP on April 4, 2002, expressly stating that they were doing so, not because they agreed that it was appropriate, but solely to enable Anna to receive some special education services, rather than none.  Complaint ¶20; Answer ¶20; Tr. at 47; Bates Label 10 (referencing "attached letter", Bates Label 132).

### C.   Implementation of the March 26, 2002, IEP.

Anna was educated under this IEP for the remainder of the 2001-02 school year.  Complaint ¶23; Answer ¶23.  However, it proved to be too little, too late.  Despite the clear and agreed-upon need for the intensive services of 1:1 support, it took months for this IEP service to

8

be effected; the dedicated aide did not begin working with Anna until approximately May 20, 2002, just weeks before the end of the 2001-02 school year.  Complaint ¶22; Answer ¶22. Adding insult to injury, the aide was not educated, experienced, trained or qualified to work with students with Asperger's Syndrome – she was a recent high school graduate with "no experience or training in dealing with a child with a complex emotional problem."  Tr. at 91, 136. Obviously, this lack of specialized training ran contrary to the IEP Team's recommendation, and the recommendation of DCPS' own psychologist.  Complaint ¶¶21 and 22; Answer ¶21; Bates Label 144 (notes from the March 26, 2002 IEP Meeting).  Tr. at 24-25, 29-30, and 91.  With no acceptable explanation, Anna was denied months of required services.[2]  There can be no question that DCPS should have been providing Anna's services during this time period, as her IEP specifically so requires.

The Schoenbachs realized that DCPS had not and still was not giving sufficient or consistent attention or understanding to their daughter's needs.  After waiting for years without the appropriate services being provided, after the 2001-02 school year began and progressed without DCPS proposing any special education services for Anna, and then when the IEP was not implemented as written, the Schoenbachs realized that they could afford to waste no more time. They decided that Anna needed to attend a school where she could get the education so essential for her, in a setting in which she could feel comfortable, and in which she could learn.  Quite

---

[2]     This Court has specifically considered the significant impact that even a brief loss of services has on a young child: "[T]here is no question that [this student's] entering [her educational program] a month late would be highly inappropriate, and even further disadvantage this handicapped child.  A month lost in the life of a child is forever lost, an 'eternity' . . . ." *Davis v. District of Columbia Bd. of Ed.*, 522 F. Supp. 1102, 1111 (D.D.C. 1981).

candidly – and quite understandably – these parents had lost a good deal of faith in the school system's ability to provide what their daughter needed.

Based on the recommendations of the experts who have evaluated and worked with Anna, the Schoenbachs concluded that Kingsbury Day School ("Kingsbury"), a nonpublic day school that serves gifted students with learning disabilities, would be an appropriate placement.  Tr. at 99-100.  Kingsbury can provide Anna with a small setting, individualized attention, and a highly structured, multidisciplinary, fully integrated program designed for students with emotional disabilities and high cognitive ability.  The school also incorporates into the curriculum related services, social supports, and behavior management strategies, all of which Anna undisputedly requires.  Testimony of Piper Caswell, *passim*.  Anna's parents submitted an application for Anna's admission to Kingsbury for the 2002-03 school year, and the school accepted her.  Tr. at 100.

Because they continued to believe that DCPS did not propose an appropriate education for Anna for the 2002-03 school year, her parents advised DCPS of their intent to place Anna at Kingsbury at the start of that school year.  By letter dated April 12, 2002, the parents advised the school system of their intent to place Anna at Kingsbury at the start of the 2002-03 school year, and requested DCPS support for this placement.  Complaint ¶27; Answer ¶27.  They received no response.  She enrolled on the first day of school and has been there since.

Kingsbury is now providing Anna with a small setting, individualized attention, and a highly structured, multidisciplinary, fully integrated program designed for students with educational disabilities resembling Anna's.  There, she is able to receive the related services that she requires, integrated into the curriculum.  Testimony of Ms. Caswell, *passim*.  She now has

the opportunity to receive educational benefit, and has made significant progress during the first

half of this school year.

### D.      The September 9, 2002, Due Process Hearing.

On July 3, 2002, the parents requested a due process hearing, alleging that DCPS failed to

identify Anna's needs and provide her with appropriate special education services in accordance

with the IDEA and D.C. law.  Complaint ¶30; Answer ¶30.  In particular, they challenged the

school system's promise to provide Anna with a number of services, and subsequent failure to do

so.  A due process hearing convened on September 9, 2002, before Impartial Hearing Officer

Seymour DuBow, Esq.  Complaint ¶31; Answer ¶31.

At this hearing, both sides presented testimony and written exhibits on the substantive

issues of Anna's case: her specific disabilities and their impact on her education, the school

system's failure to provide her with the services that were promised and required by her IEP, the

school system's failure to propose an appropriate program and placement for her for the current

school year, the distinct appropriateness of the Kingsbury program for Anna, and the educational

benefit that she has obviously and undisputedly been able to receive there.

However, much of the evidentiary presentation was one-sided; not only did DCPS not

present *any* testimony or written evidence to refute the contention that Anna could make progress

and receive educational benefit from a placement at Kingsbury, but even more critically, DCPS

did not present testimonial or documentary evidence necessary to meet its *own* burden of proving

that its proposed IEP was appropriate to meet Anna's needs.  Not only were the two DCPS

witnesses incompetent to testify to the appropriateness of the proposal, but they did not even

*attempt* to do so.  Additionally, neither witness had a complete, in-depth understanding about

Anna's complex social-emotional and educational needs, and Scott Cartland, the assistant principal of Murch, and the only DCPS witness with direct knowledge of Anna, is not a special educator.  Most critically, <u>no one ever asked either DCPS witness whether the proposed IEP was appropriate for Anna</u>, and <u>neither answered this question</u>.

## II.     The Due Process Hearing Decision.

Incredibly, in a decision dated September 17, 2002, the Hearing Officer determined that Anna continued to be eligible for special education services, but that she was not entitled to placement and funding at Kingsbury, based on a finding that DCPS offered Anna a program calculated to provide her educational benefit.  This decision contains palpable errors of fact and law.  The Hearing Officer could not have regularly made this single finding, as it directly contradicted *all* of the evidence before him,[3] since the record did not contain competent evidence to support it, and since DCPS did not meet its burden of proving this fact.

## III.    THE STANDARD OF REVIEW FOR SUMMARY JUDGMENT.

In order for summary judgment to be granted, a party must demonstrate that there are no facts in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of fact is considered to be "genuine" if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

This reviewing Court must consider the administrative findings below with the proper degree of deference.  The D.C. Circuit has established the applicable standard of deference in

---

[3]     The D.C. Municipal Regulations require that a Hearing Officer's "findings of fact [must be] based upon the evidence and testimony . . . ."  5 D.C.M.R. § 3023.1.

IDEA proceedings.  This standard incorporates the Court's obligation to give "due weight"[4] to

the factual findings, with the considerable freedom to discard any findings that are not *regularly*

*made* and substitute them with independent decisions based on a preponderance of the evidence

contained in the Court and administrative records.

So, this Court must only consider the Hearing Officer's findings of fact as *prima facie*

correct where they are also *regularly made.*  The Court then makes an independent decision

based upon the preponderance of the evidence.  *See e.g., Kerkam v. McKenzie*, 862 F.2d 884

(D.C. Cir. 1991).  This standard of review "plainly suggest[s] less deference than is

conventional" in other agency actions.  *Id.* at 887.

Where, as in Anna's case, the factual findings are not regularly made, or the application

of the law to these facts is erroneous, deference is simply not due.  As this Circuit has

established, the "party challenging the administrative decision must at least take on the burden of

persuading the court that the hearing officer was wrong, and . . . a court upsetting the officer's

decision must at least explain its basis for doing so."  *Kerkam*, 862 F.2d at 887.

The evidence and arguments that the parents set forth herein and below clearly

demonstrate that the Hearing Officer imposed the burden of proof on the wrong party;

disregarded relevant, reliable evidence and testimony; and improperly credited testimony of

DCPS witnesses who lacked both expertise and factual knowledge regarding Anna's needs, and

who never testified to the appropriateness of the proposed program.  He then compounded his

---

[4]       In the context of the IDEA, a federal court must give "due weight to the findings of the
local and state educational agencies even though it must eventually make an independent
decision based upon a preponderance of the evidence."  *Hendrick Hudson Dist. Bd. of Ed. v.
Rowley*, 458 U.S. 176, 205-06 (1982).

errors by ignoring the legal significance of the school system's due process violations and

concluding that DCPS did not deny Anna a FAPE.  Thus, the Hearing Officer's decision is fatally

flawed for two independent reasons: 1) he applied the wrong legal standard, and 2) his factual

findings were not "regularly made."

>    **A.    Summary Judgment in IDEA Cases is a Vehicle for the Court to Decide the
>    Case on the Basis of the Administrative Record, Based on a Preponderance
>    of the Evidence.**

Pursuant to the Federal Rules of Civil Procedure, a Court shall render summary

judgment:

> [I]f the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter of law.

FED.R.CIV.P. 56(c).  DCPS has denied very few material facts in its Answer.  Had defendants'

Answer contained denials to the material factual allegations, a defense to the Schoenbachs'

motion for summary judgment would arise where a consideration of all of the evidence in the

record reveals material issues of fact.  In such a review, it is important to note that the record

before the Court does not represent the absolute boundaries of the Court's review; rather, unlike

actions based on other administrative decisions, the record in the IDEA case represents but a

single source for the Court's review.  The IDEA instructs that district courts, upon hearing an

action brought for review of administrative proceedings, "*shall receive the records of the

administrative proceedings,* shall hear additional evidence at the request of a party, and, *basing

its decision on the preponderance of the evidence*, shall grant such relief as the court determines

is appropriate."  20 U.S.C. § 1415(e)(2) (emphasis added).  A proper summary judgment inquiry

in the present case thus requires the Court to conduct a much broader review than of mere facts contained in the parties' pleadings.

The Supreme Court has also recognized this Court's mandate to consider more than the evidence appended to the summary judgment pleadings now before the Court. "Congress intended courts to make bounded, independent decisions -- bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd, Burlington Sch. Comm. v. Dep't of Educ.,* 471 U.S. 359 (1985).

**B.    The Court Must Give a Lesser Degree of Deference to IDEA Administrative Decisions Than to Other Administrative Decisions.**

In its review of the administrative record, a district court does not accord absolute deference to the decision of the Hearing Officer. While "due weight" is afforded to the administrative decision, "the [Court must [also] independently evaluate" the facts contained in the administrative record, from both testimony and exhibits. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1053 (7th Cir 1997). Thus, it would be improper to accept as absolute fact either the factual findings in the administrative decision or the decision itself. Rather, before determining whether factual disputes exist, a proper analysis must first consider all of the evidence. Only then can the Court make a determination of whether the Hearing Officer erred in his decision, or departed from the normal decision-making process. Should this Court determine that the Hearing Officer did make findings of fact or a decision in error, the Court should not accord the decision any deference. These are the circumstances in the present case.

The Fourth Circuit in *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659 (4th Cir. 1998), noted that it is appropriate to afford substantially less deference to an administrative decision

which is "both cursory and conclusory." *Id.* at 663.  Here, the Hearing Officer erred in applying

the law to the facts about what the school system was obligated to offer Anna.  Through these

errors the Hearing Officer arrived at a baseless decision that can only be described as "cursory

and conclusory."

The administrative decision is never entitled to such a strong presumption of correctness

as to negate the need for a thorough review.  *Rowley*, 458 U.S. at 205-06.  Courts need only allow

administrative decisions a degree of significance proportionate to the magnitude and relevance of

the rest of the evidence.  This Court must evaluate all of the evidence to determine whether the

Hearing Officer's factual findings are correct, and whether the Hearing Officer properly applied

the law to these facts.

## IV.    THE HEARING OFFICER MISAPPLIED THE BURDEN OF PROOF.

The Hearing Officer here gave lip service to the burden of proof, stating at the outset that

DCPS bore the burden of proving all issues before him.  However in conducting his analysis, he

somehow ignored this rule of law, and erroneously placed the burden of proof on Anna's parents,

requiring them to prove that the school system *did not* propose an appropriate program and

placement for Anna.  He specifically held that, "DCPS has met its burden of proof in this case

that it has developed an appropriate IEP that provides educational benefit to Anna."  Bates Label

5.  It is impossible to conceive of how a party that offers *no testimony whatsoever* about its IEP,

and how it has provided or will provide benefit to a student could have met this burden.

Obviously, the Hearing Officer was looking to the parents to disprove the IEP's appropriateness,

which they need not have done; though they did so, the Schoenbachs had no obligation to

disprove the appropriateness of an IEP that had never been proved appropriate.  The Hearing

Officer should have allocated the burden to DCPS to prove affirmatively that it *did* make an appropriate proposal.

### A.     DCPS Bore the Burden of Proof on <u>All</u> Issues Before the Hearing Officer.

Under 5 D.C.M.R. § 3022.16, "The D.C. Public Schools shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student."  This Court has historically held that DCPS bears the burden of proof in all administrative hearings, including those concerning the eligibility of a child for special education services under the IDEA.  *Kroot v. District of Columbia*, 800 F. Supp. 976, 982 (D.D.C. 1992) (explaining 5 D.C.M.R. § 3022.16).  Though the Hearing Officer acknowledged this burden, he never actually <u>applied</u> the burden to DCPS.

At the due process hearing, DCPS unquestionably did not meet its burden.  The precursor to *Kroot, Mills v. Board of Educ. of Washington, D.C.*, 348 F. Supp. 866 (D.D.C. 1972), precipitated the passage of the Education for All Handicapped Children Act of 1975 (now the IDEA), and found that constitutional principals of due process and equal protection necessitated the District bearing the burden of proof as to all facts as to the appropriateness of any placement, denial of placement or transfer.  By that reasoning, DCPS also bears the burden of proving that the converse is true of the parents' unilateral placement.  DCPS did not meet this burden.  Even though the parents did <u>not</u> have the burden of showing that the Kingsbury is an appropriate placement for Anna, they nevertheless did so.

**B.      DCPS Was Unable to Prove that Its Proposal Was Appropriate.**

Not only did DCPS *not* meet its burden of demonstrating that the proposed program and

placement were appropriate for Anna, it is obvious that it *could not meet this burden*, since its

witnesses did not support this proposition, and the subjects to which these witnesses testified was

quite limited.  Along with the Hearing Officer's responsibility for the critical allocation of which

party had the burden to establish whether the school system had proposed an appropriate program

and placement for Anna, he had the accompanying task of assessing the competency of the

witnesses.  Specifically, the witnesses had to have the expertise and direct knowledge of Anna to

testify whether the proposed program and placement were appropriate for her, and how the IEP

goals, objectives, and related services were individualized to meet her specific needs.

### 1.      No DCPS Witness Testified That the Proposed IEP Was Appropriate to Meet Anna's Needs.

At the hearing, DCPS only introduced the testimony of (1) Assistant Principal Cartland,

and (2) clinical psychologist Dr. Adomaitis.   Neither was actually able to speak either to the

progress that Anna was making on the bulk of her then-current IEP goals and objectives, nor to

the appropriateness of the proposed IEP for the upcoming school year.

- Neither Mr. Cartland nor Dr. Adomaitis **were asked nor answered any specific questions related to the proposed IEP and placement**.

- Neither Mr. Cartland nor Dr. Adomaitis were asked nor answered any questions about **whether this proposed IEP and placement were appropriate** for Anna, nor **whether she could benefit or had benefitted** from them.

- Neither Mr. Cartland nor Dr. Adomaitis could speak to Anna's **occupational therapy needs, her speech-language issues, or her actual academics**.

- The Hearing Officer made **no findings whatsoever** that Mr. Cartland or Dr. Adomaitis had testified – credibly or otherwise – as to the appropriateness of the proposed IEP and placement.  *See* Hearing Officer's Decision at 5.

18

The school system proposed and was then required to support this program for Anna, yet was unable to introduce a single witness who could testify that the proposal was appropriate to meet her needs.  Any party bearing the burden of proof on factual issues cannot meet its burden if it produces no relevant facts.

### 2.    The Hearing Officer Erred By Giving Weight to DCPS Witnesses.

The DCPS witnesses were not competent to testify as they did, and the Hearing Officer offered no explanation for his decision to defer to their opinions above those of qualified experts and those who knew Anna personally.  The law is clear about how a judiciary must allocate deference: "In considering the evidence, the reviewing court must give 'due weight' to the expertise of the school officials responsible for providing the child's education.  Where there is no indication that the school officials' expertise has been brought to bear on the individual needs of the handicapped child, however, the deference granted will be commensurately lower."  *McKenzie v. Smith*, 771 F.2d 1527, 1535 at note 17 (D.C. Cir. 1985) (*quoting Rowley*, 458 U.S. at 206); *see also, Davis*, 522 F. Supp. at 1109.

There were many reasons Mr. Cartland's testimony was not competent:

1.    He did not work with Anna directly;

2.    He was not entirely familiar with her educational profile, as he was largely responsible for developing the IEP, Tr. at 86-87,  that ultimately reflected "no sensitivity . . . as to what Asperger's children require."  Tr. at 126;

3.    He is not a special educator.  Tr. at 60-61; and

4.    He has not had any formal undergraduate, graduate or in-service training regarding the intricacies of Asperger's Disorder.  Tr. at 61.

Mr. Cartland based much of his testimony on conversations with Anna's teachers and Murch staff, rather than on personal experience with Anna in the hall or in class.  In testifying about her educational needs and their manifestations and progress, Mr. Cartland offered much testimony based on second-hand information, particularly where information prior to the 2001-02 school year, when Mr. Cartland began working at Murch.  Tr. at 75.  Some of this information was plainly misunderstood by Mr. Cartland, such as whether Anna had suffered teasing or bullying at school, as a result of her being disliked by peers due to her social inabilities.  Mr. Cartland testified that he understood that he was the "main disciplinarian in the school", and that "nothing ever rose to the level with which it was brought to my attention about Anna being picked on or teased or harassed in any way."  Tr. at 50.

In contrast, Mr. Schoenbach testified that Anna was brutally teased, and in fact, even *tied up* by her fellow third graders.  Tr. at 77.  He testified that "she was a magnet" for teasing and bullying, that her seat therefore had to be moved four or five times in fourth grade, that he "very aggressively met with" the fifth grade classroom teacher and the school nurse on this issue, and that he "brought it to Mr. Cartland's attention, that this was a constant problem."  Tr. at 77-78. Mr. Schoenbach also described how the school had made a tremendous effort to place Anna in a "very caring class" for fifth grade, which had reduced the teasing.  However, apparently, had the third or fourth or fifth grade teachers, or the school nurse, or someone else who was involved

with Anna during these prior school years, been present at the hearing,[5] he or she could have

confirmed the fact of Anna's social emotional issues and the problems they caused her at school.

*Cf.* Hearing Officer's Decision at 4.

Mr. Cartland's testimony was further undermined by his incomplete knowledge of Anna's

educational strengths and weaknesses.  He had no training and little experience with Asperger's

Syndrome, and equated much of her academic success with overall educational progress, rather

than looking at the more crucial social-emotional component so fundamental to Asperger's

Syndrome.  Much of Mr. Cartland's testimony about Anna's progress was based on her superior

intellectual abilities, and did not take into account the areas in which the specifics or severity of

her Asperger's-based disabilities impacted her success.  Based upon this incomplete, misguided

"knowledge," he simply had no foundation upon which to testify regarding this student's

abilities.

Moreover, Mr. Cartland lacked the expertise to testify competently as to what would be

appropriate to address Anna's needs.  Though he testified about Anna's special education

program in general – critically, while never addressing the specifics of the proposed IEP or

placement – Mr. Cartland is not a certified special educator, nor has he ever taught special

---

[5]     The missing witness rule has for nearly a century been well-settled in this Court.  In 1915,
the D.C. Circuit Court of Appeals upheld jury instructions providing: "as a matter of law, that if
you find that [a party] in this case has failed to call and examine as a witness any person who has
knowledge of material matters at issue in the case, the fact that [the party] has so failed to call
and examine such witness creates the presumption that the testimony, if produced, would be
unfavorable to [that party's] case."  *Carmody v. Capital Traction Co.*, 43 App.D.C. 245, (C.A.
D.C. 1915).  It is particularly telling that the witnesses who might have been able to speak to
Anna's needs, and to how the IEP addressed them – *e.g.* Anna's classroom teacher – were not
present at the hearing.  On the fundamental issue of Anna's success at Murch, an adverse
inference should be drawn against DCPS because of the absence of these critical school
personnel.

education.  Tr. at 60-61.  It defies reason to base a decision about Anna's special education needs on Mr. Cartland's opinion.  DCPS simply could not meet its burden of proof through such uninformed and incompetent testimony.

On the other hand, Dr. Adomaitis had a different and extremely limited perspective on Anna.  He testified that he never evaluated Anna, and never observed her in a classroom setting. In fact, his only knowledge of Anna came from participating in her IEP meeting, in which he reviewed a report by DCPS Psychologist Dr. Ada Vincent, who *also* had not observed or evaluated Anna, but had only reviewed the private evaluation from Drs. Edelstein and Andrews. Tr. at 26-27.  Bates Label 69-72.  Dr. Adomaitis' information was actually third-hand.  Thus, he was able only to confirm what he had heard others say: that Anna "was progressing well.  And she's progressing according to grade-level."  Though he may be an excellent therapist and a credible witness, and though he may have heard others at the IEP table discuss how Anna was progressing at Murch, Dr. Adomaitis could not and did not try to testify as to the appropriateness of her proposed IEP or placement, other than to describe his recommendation for a 1:1 dedicated aide for all of her academic subjects – an aide who was "well-versed with the specifics of Asperger's Syndrome."  Complaint ¶21; Answer ¶21; Bates Label 144 (notes from the March 26, 2002 IEP Meeting).  Tr. at 24-25, 29-30.

So, not only were the DCPS witnesses unable to testify to the appropriateness of the proposed IEP, but in fact, no DCPS witness even *attempted* to do so.  The record is devoid of any discussion whether the goals and objectives were appropriate, or whether the types of related services proposed were appropriate, or whether any of this was sufficient to meet Anna's needs. The IEP includes proposed goals and objectives in the areas of **social-emotional, mathematics,**

**written language, organizational skills, interpersonal/social skills, coping skills,** and

**attending skills** (curiously and impossibly, all to be addressed in the 1.5 hours per week that she

would receive special education).  Yet DCPS did not introduce testimony from the classroom

teacher, the special education teacher or anyone else who regularly taught her any of these skills,

nor who could speak to what Anna needed to succeed.  Additionally, DCPS *neglected to propose*

a number of critical goals, objectives and services for this troubled student, as identified by her

parents in their April 4, 2002, letter.  Bates Label 132.  DCPS did not seek to introduce any

testimony from Dr. Adomaitis to meet their burden of proving why these additional goals and

objectives were unnecessary.[6]  In contrast, the parents produced both expert and lay testimony,

and written evaluations, as to all of these needs.  It is inconceivable that DCPS could have met its

burden of proof without this basic evidence.

Thus, the school system was unable to introduce a single witness who was competent to

testify that the proposal was appropriate to meet Anna's needs, or who even tried to do so.  The

Hearing Officer offered no explanation for 1) his reliance upon the DCPS witnesses' unqualified,

uninformed and limited testimony, or 2) how DCPS could possibly have met its statutory

burden.  The resulting decision was thus a travesty of Due Process.

## V.  THE HEARING OFFICER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW WERE CONTRARY TO THE LAW AND EVIDENCE.

### A.  DCPS Did Not Propose an Appropriate Educational Program for Anna.

---

[6]     Any single one of these omissions or gaps in the IEP would, in and of itself, be sufficient to render the IEP inadequate.  Taken together, they clearly result in an IEP that was never – and never could have been – demonstrated to be appropriate to meet Anna's needs.

The importance of a comprehensive IEP cannot be stated strongly enough.  The IEP is basically a "blueprint" for a disabled child's special educational program:

> The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes (I) a statement of the child's present levels of educational performance . . . ; (ii) a statement of measurable annual goals, including benchmarks or short- term objectives . . . ; (iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . ; (iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children . . . .

20 U.S.C. §1414(d)(1)(A); *see also* 34 C.F.R. §§ 300.340(a) and 300.347.(a)(1)(I).  The Supreme Court has made clear that an IEP is intended to provide an outline for the provision of a FAPE  to a disabled student.[7]  "The free, appropriate, public education required by the [IDEA] is tailored to the unique needs of the [disabled] child by means of an . . . IEP."  *Rowley*, 458 U.S. 176; s*ee also*, *Honig v. Doe*, 484 U.S. 305, 311 (1988); *Burlington School Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359, 368 (1985), *aff'g Town of Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir. 1984).

Thus, the IDEA requires that placement be based upon the IEP.  34 C.F.R. § 300.552. See *Spielberg v. Henrico County Pub Sch.*, 853 F. 2d 256, 258-59 (4th Cir. 1988), *cert. denied*, 489 U.S. 1016 (1989) (holding that in deciding "to place [the student at a certain school] before developing an IEP on which to base that placement," the school system violated the IDEA).

---

[7]     The IDEA defines a free appropriate public education as "special education and related services that . . . (D) are provided in conformity with the individualized education program . . . ." 20 U.S.C. §1401(8).

There can be no determination of the appropriateness of a proposed placement without reference to the appropriateness of the IEP.

It is *from the IEP that the child's placement is determined.*  34 C.F.R. § 300.552(a)(2). "The public agency must ensure that the IEP services are provided in a manner that appropriately meets the child's needs as specified in the IEP."  34 C.F.R. Part 300, Appendix A - Notice of Interpretations on IEPs, 64 Fed. Reg.12,478.  So critical is the IEP that if it is inappropriate, any placement based on that IEP is by default inappropriate.

Thus, where Anna's IEP is incomplete and not tailored to address her needs completely, it is necessarily inappropriate; any placement based upon this IEP must inevitably be inappropriate. As Dr. Edelstein testified, "the IEP doesn't related to who she is."  Tr. at 129.  The Hearing Officer's findings to the contrary are in direct and overt contravention of the facts and law.

### 1.     The IEP Goals and Objectives Are Not Calculated to Enable Anna to Make Progress in her Writing Skills.

For years, DCPS has attempted to teach Anna to write, without much success – this extremely bright child's inability to put her "broad," high-level thoughts onto paper resulted in enormous frustration.  At the MDT Meeting, Anna's father described her writing as "laborious" and her fifth grade teacher Ms. Robinson agreed, expressing that "Anna's frustration came from her inability to write quickly enough to keep up with her thinking . . . ."  Bates Label 25-26. Obviously, such a bright child should be able to learn to express herself in writing, if she is taught in a way appropriate for her, and given the correct supports and modifications.  But, her various disabilities prevent her from learning to write when she is not taught in a manner appropriate to those disabilities.

Despite the uncontradicted truths, the IEP contains three broad objectives for written language, Bates Label 14, and provides no pull-out or plug-in special education support to work with her on these objectives.  As Mr. Cartland testified, the sixty minutes weekly of resource room time was dedicated to working on organizational skills, not written language.  Tr. at 57-58. Yet, the school system did not offer any explanation at the hearing as to why this service was so lacking, or how Anna could possibly achieve these written language goals without support and service.

2.     **The IEP Does Not Contain Any Goals, Objectives or Services for Occupational Therapy.**

The MDT Team discussed the matter of Anna's written language issues, particularly as they related to Occupational Therapy.  Her parents shared with the IEP team that Anna had benefitted from the private Occupational Therapy that they had arranged, Tr. at 81, 83-84.  Dr. Vincent agreed that "it does not appear that [visual/nonverbal and motor kinesthetic, and visual-spatial organizational and visual-motor] areas are currently problematic which may be because of the [outside] ongoing work in Speech and Language and Occupational Therapy which according to reports have been showing positive results."  Bates Label 72.  At the MDT Meeting, "A lengthy discussion ensued about what an OT could address in terms of handwriting[,]" as well as about her diagnosed sensory integration dysfunction, her posture, and her "seating choices", *e.g.* sitting under the table rather than in a chair like the other students.  Bates Labels 25, 26.

However, despite these concerns and the agreed-upon benefit of the outside Occupational Therapy services, the team was still unable to include any Occupational Therapy goals, objectives or services in Anna's IEP because the report was not complete until after the meeting, and the parents did not receive it until June 13, 2002, three months after the IEP was developed.

26

Tr. at 88; Bates Labels 77-79.  So, the team ultimately denied her access to this service as well.

Again, the school system offered no explanation at the hearing as to why this service was

omitted, or how Anna could possibly succeed without such an obvious and critical related

service.

> **3.      The IEP Does Not Contain any Goals, Objectives or Services for Speech-Language Therapy.**

Socially pragmatic language development poses a tremendous hurdle for students with

Asperger's Syndrome.  Tr. at 19, 116-119, 130-31.  As Dr. Edelstein testified, "the prognosis [for

student's with Asperger's] can be positive if these children are put in situations that are

appropriately supportive of what their intellectual abilities are, in that they are cultivating

adaptive skills; meaning the ability to communicate with others, the ability to have some social

reciprocity, the ability to understand and adapt to a situation."  Tr. at 118.  Anna's father testified

that the family had obtained outside speech-language therapy for her, and that this therapy had

proved successful.  Tr. at 81, 83-84.  Dr. Vincent's report, Bates Label 72, confirmed the positive

results of her outside speech-language therapy.

The MDT Team agreed that Anna has deficits in this area, noting that her "[a]pplication

of pragmatic and social language impact academic and social growth; [and that her] organization

of language is weak."  Bates Label 11.  These issues are commensurate with her diagnosis of

Asperger's Syndrome, as explained by both Dr. Adomaitis and Dr. Edelstein.  Similarly, the

DCPS Speech-Language Evaluation, Bates Labels 73-76, found that while Anna "can cognitively

conceptualize and explain situational language (i.e., Components of pragmatic language

including physical setting, audience, topic, etc.), she does not implement these skills in social

settings."  Bates Label 75.  Therefore, the DCPS speech pathologist "strongly recommended that

Anna practice social interactions in the classroom setting, with the aid and modeling of peer

buddies . . . [with a focus on] increasing Annas' interest in social interaction as well as repetition

and generalization of correct social applications."

But, though Anna has well-documented needs and two objectives that fall under the goal

of "Interpersonal/Social Skills," Bates Label 26, the school system IEP provides her no

opportunity to work on these areas, other than in the general education classroom.  Still again,

DCPS witnesses at the hearing did not explain why the team decided not to offer her speech-

language services to work on her pragmatic language and social deficits, and also did not explain

how Anna, a student with Asperger's Syndrome, would be able to initiate and achieve these

Interpersonal/Social Skills goals on her own.

> **4.      The IEP Does Not Address a Number of Other Necessary Areas for Anna.**

Drs. Edelstein and Andrews conducted a comprehensive evaluation of Anna that DCPS

*never disputed in any way,* even after two psychologists, Dr. Vincent and Dr. Adomaitis,

reviewed it.    The IEP team had this report in hand when it developed the IEP for Anna, and was

able to review the report's very specific and well-explicated recommendations for Academic

Remediation.  Bates Label 96 and 99.  *Still*, the IEP is sorely lacking in a number of the areas that

Drs. Edelstein and Andrews made recommendations, including: individual counseling and social

skills training (sixty minutes per week), social skills group (30 minutes per week), adaptive skills

necessary for independent living, organizational skills for writing, reading assistance for

comprehension, keyboarding skills, and an overall behavior management approach to teaching

her.  Dr. Edelstein testified that Anna, like all students with Asperger's Disorder, requires:

> a full-time comprehensive program which has a complete behavior management
> strategy incorporated within the curriculum; which has a social curriculum as a
> component of every interaction within the curriculum; that is very rule-guided so
> [that Anna would] have charts . . . scripts [that are] a logarithm for all aspects of
> the worls as you and I cope with it that [she] can't deduce.

Tr. at 127.  There can be and has never been any dispute that Anna requires all of these services

in order to benefit from her educational program, and it also cannot be disputed that the proposed

program does not provide any of these services, so integral to teaching a student with Asperger's

Syndrome.  Even if the parents had borne the burden of proof at the hearing, there really was only

one side to the relevant competent facts here – and still the Hearing Officer was not persuaded.

### 5.     DCPS Never Provided the Dedicated 1:1 Aide That The IEP Requires.

The March 26, 2002, IEP team specifically determined that Anna needed to be assigned a

1:1 dedicated aide for all of her academic subjects.  Dr. Adomaitis recommended that this aide be

"well-versed with the specifics of Asperger's Syndrome."  Complaint ¶21; Answer ¶21; Bates

Label 144 (notes from the March 26, 2002 IEP Meeting).  Yet, despite the clear and agreed-upon

need for the intensive services of 1:1 support, it was *months* before this service began; the

dedicated aide did not begin working with Anna until approximately May 20, 2002, just weeks

before the end of the 2001-02 school year.  Complaint ¶22; Answer ¶22.  Even more critically,

the aide was not anything that she was promised to be: she was not educated, experienced,

trained or qualified to work with students with Asperger's Syndrome – she was a recent high

school graduate with "no experience or training in dealing with a child with a complex emotional

problem."  Tr. at 91, 136.  Obviously, this lack of specialized training ran contrary to the IEP

Team's recommendation, and the IEP Itself.  Complaint ¶¶21 and 22; Answer ¶21; Bates Label

144 (notes from the March 26, 2002 IEP Meeting).  Tr. at 24-25, 29-30, and 91.

Thus, Anna was denied months of required services without acceptable explanation, and the aide, upon whom so many hopes had been pinned, was not the qualified support person that the team concluded she had to be.  Rather than helping, Anna's work with the aide was "an absolute disaster."  Tr. at 93.  This much is clear:  DCPS proposed and should have provided Anna the services of an experienced and trained 1:1 aide during the duration of the IEP.  There can also be no question that DCPS did not do so.  At the hearing, DCPS offered no explanation for this failure.  Like so much else, the Hearing Officer ignored all of this.

**6.     Anna Requires More Special Education and Less Inclusion in the General Education Environment.**

Putting aside all arguments about environment and peers and required goal areas, the proposed program simply does not provide underline enough special education to this extremely gifted, but extremely disabled student.  Under the DCPS proposed IEP, Anna would spend only four percent of her time receiving special education services and support, including one-half hour weekly of counseling.  Bates Label 10.  The rest of the time, she would be in the general education environment.  How that can be enough special education for this child, the Hearing Officer never explains.  Afterall, Drs. Edelstein and Andrews recommended – and DCPS never disputed – that, "Anna will require a school placement where she has a small, highly structured classroom with extensive opportunity for individual attention, use of individualized learning approaches, and small group work with a multi-disciplinary staff knowledgeable about the specific needs of children with Asperger's Disorder."  Bates Label 96.  As is undeniable throughout the entire IEP, DCPS agreed with all that was in this evaluation, but then disregarded the expert recommendations when it came to programming for this student.  Having observed the classroom at Murch, Dr. Edelstein concluded, "it's not possible for [the instruction] to be individualized to

meet Anna's needs . . . . [I]t's not a criticism of the teacher. It's not possible to do that in a large

class that is a mainstream setting." Tr. at 135. For some reason, and as with so much else, the

Hearing Officer ignored this evidence – the *only evidence* at all that he heard regarding whether

this type of setting was appropriate for Anna.

### B. The Hearing Officer Erred By Failing to Recognize DCPS' Inability to Prove the Appropriateness of Its Proposed IEP.

Perhaps the Hearing Officer was confused as to whether DCPS was aware, or should have

been aware, that Anna needed all of these services incorporated into her educational program.[8]

However, federal law is very clear that DCPS bears the burden of identifying and addressing

Anna's educational needs.[9] The IDEA and federal regulations give an umbrella term to the

school system's obligations, *child-find*, which incorporates a number of responsibilities for the

school system to locate its students with special needs, and to identify and address all of their

needs. Congress requires that the school system "must have in effect policies and procedures to

ensure that all children with disabilities residing in the State, including children with disabilities

attending private schools, regardless of the severity of their disability, and who are in need of

special education and related services, are identified, located, and evaluated . . . ." 34 C.F.R.

§ 300.125 (a)(1)(I). Having found these children, the school system must then "ensure that

FAPE is available to all children with disabilities . . . ." 34 C.F.R. § 300.300 (a)(1). So, even if

the Schoenbachs had *not* brought these issues and the accompanying expert recommendations to

---

[8]     It should be noted that DCPS never established at the hearing that any of these services are available in a neighborhood school setting.

[9]     The federal regulations require the school system first to ensure that, "The child is assessed in all areas related to the suspected disability. . .", and then to develop all goals and objectives related to "Meeting the child's needs that result from the child's disability . . . ." 34 C.F.R. §§ 300.532(g) and 300.347(a)(2)(i).

31

the IEP team's attention, DCPS *still* should have recognized all of Anna's areas of need, and developed a program that could address them.

While the record is clear that the team heard and made written notes of Anna's various and pervasive issues, Bates Labels 23-26, no school system personnel ever followed up on the issue or made any effort to develop an IEP that would address these problems in school. The Hearing Officer could never have found that the parents failed to call Anna's issues to the attention of the IEP team.  The parents provided Drs. Edelstein and Andrews' comprehensive evaluation to the Murch staff, Dr. Edelstein herself attended the March 26, 2002, MDT meeting (though another obligation forced her to leave before the IEP was completed), and the parents testified, as the MDT and IEP Team notes reflect, that they were extremely forthcoming about all of Anna's needs.   There is irrefutable evidence that the Schoenbachs raised these issues at the MDT and IEP meetings, that DCPS made written note of Anna's problems, and that the parents even signed the IEP with their April 4, 2002, caveat about all that they believed the IEP was lacking.  The IEP's weaknesses cannot be attributed to the parents, who never had any obligation to tell school system experts how to write an IEP; rather, DCPS was required to do whatever was required to ascertain what goals and objectives would provide Anna a FAPE.

What is clear from the administrative record is that DCPS never took the opportunity at the hearing to explain *why* the IEP Team failed to develop an IEP that included any of the areas it was missing.  The parents had made clear what they were challenging, and DCPS did not defend its own decisions to omit these areas from the IEP.  Yet the Hearing Officer without reason found that DCPS had demonstrated that its IEP was appropriate, without hearing any evidence that Anna did not need these numerous services.  In fact, based on the testimony regarding the

dedicated aide, it is impossible to conceive how the Hearing Officer could find that Anna would receive the education to which she was entitled, when no DCPS witness could even testify that she received the services that she was *promised*.

C.    **Without Any Basis in Fact or Evidence, the Hearing Officer Erroneously Found That DCPS' Proposed Placement Was Appropriate for Anna.**

The Hearing Officer correctly noted the applicable standard under which he was to review the evidence, but then wholly ignored it, stating that, "DCPS has met its burden of proof in this case that it has developed an appropriate IEP that provides educational benefit to Anna." Bates Label 5.  This finding is erroneous as DCPS put on no competent evidence in the areas of mathematics, written language, organizational skills, social skills, adaptive skills, Occupational Therapy, or Speech-Language, and dedicated just thirty minutes per week to addressing the social-emotional, interpersonal/social, coping, and attending skills that are at the very core of her Asperger's Syndrome.  It also cannot be stated enough that DCPS introduced no testimony whatsoever about the appropriateness of the IEP goals, objects, accommodations, modifications, related services, level of service or placement.  Any one of these flaws, by itself, is fatal.  It defies rationality that the preponderance of evidence could ever have resulted in this finding.

1.    **The Hearing Officer Had No Evidence Whatsoever That the Proposed Program Was Appropriate to Meet Anna's Needs.**

As described at length *supra*, no DCPS witness was competent to testify to the appropriateness of the IEP, and none did.  There were no discussions about whether the goals and objectives were appropriate, nor whether the related services proposed were appropriate or sufficient to meet Anna's needs.  Without such testimony, DCPS could not have met its burden of proving the appropriateness of this IEP, and with it, proving that the school system offered

Anna a FAPE.  Without testimony or evidence as to the appropriateness of the IEP, the Hearing

Officer had to find that DCPS could not meet its burden of proof.

### 2.   The Hearing Officer Ignored the Significance of the Unprovided Related Services.

Also as detailed *supra*, Anna was denied Occupational and Speech/Language Therapy

altogether, and months of the dedicated 1:1 aide's services.  The Hearing Officer heard the

testimony about these missed services, and then just got the facts wrong.  He made no findings

whatsoever that Anna was denied these services, and ignored the lapsed time period for the

aide's services.  He aggravated his factual error by failing to take it into account, or even

mentioning it, in his legal conclusions.  So, rather than finding that Anna was unacceptably

denied necessary – and legally required – services, the Hearing Officer erroneously found that

she was receiving an appropriate education.  This determination is impossible in the face of even

his flawed factual findings.

## VI.   DCPS' FAILURE TO COMPLY WITH THE MANDATES OF THE IDEA AND THE FEDERAL REGULATIONS DENIED ANNA A FAPE AND CONSTITUTED A DENIAL OF DUE PROCESS.

The United States Supreme Court, in interpreting the IDEA, has consistently stressed the

importance of due process rights to ensure that disabled children receive an appropriate

education:

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance that Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures . . . as it did upon the measurement of the resulting IEP against a substantive standard.

*Rowley*, 458 U.S. at 205-206.  Without an educational agency's attention to and compliance with statutory procedures, no child can be assured of receiving a FAPE.

Procedural violations, when they are as severe as here, constitute a denial of an appropriate education. Defendants' failure to provide Anna with adequate due process is therefore, in itself, a denial of FAPE.  However, the Hearing Officer ignored both the school system's violations and their impact on Anna's education.  To determine the correct remedy for these violations, this Court must look to the parents' legal rights when FAPE is denied.

## VII.   WHEN A STUDENT HAS BEEN DENIED FAPE, THE FUNDING OF A "PROPER" PARENTAL PLACEMENT IS THE APPROPRIATE RELIEF.

Under established Supreme Court law, the school system's failure to provide Anna a FAPE leads directly to the determination of whether her parents identified a placement that provided her with educational benefit.  The proper analysis in such an inquiry is found in *Burlington,* 471 U.S. 359 (1985), and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), *aff'g* 950 F.2d 156 (4th Cir. 1991).

In *Burlington*, the Supreme Court explained that "parents who disagree with the proposed [educational program] are faced with a choice: go along with the [proposed program] to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement."  471 U.S. at 370.  To avoid compromising a child's right to a FAPE, the Court concluded that if  "a court determined that a private placement desired by the parents was *proper* under the Act and that [a proposed] placement in a public school was inappropriate," the IDEA authorizes "retroactive reimbursement to parents."  *Id.* (emphasis added).  This result is necessary because "[t]he Act was intended to give handicapped children both an appropriate

education and a free one; it should not be interpreted to defeat one or the other of those

objectives." *Id.*

In *Carter*, the Supreme Court reaffirmed its ruling in *Burlington* and explained that

"public educational authorities who want to avoid reimbursing parents for the private education

of a disabled child can do one of two things: give the child a free appropriate public education in

a public setting, or place the child in an appropriate private setting of the State's choice." 510

U.S. at 13. There is no question that Anna is eligible for special education and related services,

DCPS did not meet its burden of proving the appropriateness of its educational proposal, and

there has never been any dispute that she is benefitting from her placement at Kingsbury.[10] Since

DCPS never proposed an appropriate program for Anna, the Hearing Officer's inquiry should

have turned directly to whether her parents' unilateral placement at Kingsbury was "proper."

---

[10]   Although Anna had only just begun attending Kingsbury at the time of the hearing, her success there this year is relevant and admissible in this Court as evidence of what DCPS should have realized that she needed. Plaintiffs have documentation of Anna's progress at Kingsbury this year, including progress reports.

This evidence is admissible and relevant under the IDEA and applicable law regarding additional evidence. *See, Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585 (9th Cir. 1992) (considering the relevance of a student's needs at the time of district court consideration, as reflected by her or her response to education subsequent to the administrative case, and holding that the child's current needs "undoubtedly reflect something of her needs" prior to this time); *Lewis v. School Bd. of Loudoun County*, 808 F. Supp. 523, 527 (D.Va. 1992) (holding that evidence regarding a student's progress in a private placement can demonstrate "by way of comparison, that in certain specific respects the [school system] IEP was inadequate."); *Justin G. v. Board of Educ. of Montgomery County*, 148 F. Supp.2d 576, 585 (D.Md. 2001) (adopting this same reasoning on the relevance of a student's educational needs subsequent to a contested administrative decision). Additional evidence supports the parents' argument at the hearing and may bear upon this Court's consideration of this motion; it serves as a reflection of Anna's needs already-existing and demonstrated at the administrative hearing.

Plaintiffs reserve the right to seek to introduce additional evidence, should it become necessary to demonstrate that Kingsbury is a proper placement for Anna. However, this issue was not contested at the hearing or in defendants' Answer, so there may be no need to proffer this evidence.

The test for whether a parental placement is "proper under the Act" is whether "the education provided by the private school is '*reasonably calculated to enable the child to receive educational benefits.*'" *Carter*, 950 F.2d at 163 (emphasis added) (*quoting Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).  It is crucial, particularly in the instant case, to distinguish the standard of "properness," required of parental placements from that of "appropriateness," required of school system placements.  Parental placements are held to a less strict standard, since "it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place." *Carter*, 950 F.2d at 164.

The Supreme Court in *Carter* specifically considered whether "parents are barred from reimbursement because the private school in which [their child is] enrolled did not meet the [IDEA] definition of a 'free appropriate public education.'"  510 U.S. at 13.  The Court held "that they are not, because [the IDEA's] requirements cannot be read as applying to parental placements."  Thus, any determination of Anna's Kingsbury placement must apply this more lenient standard of "properness."

The undisputed and unrebutted evidence demonstrates that Anna's placement at Kingsbury meets the standard of "properness."  She is making progress and getting educational benefit from her program there, as Drs. Edelstein and Andrews predicted, and as Ms. Caswell, the curriculum development specialist at Kingsbury, and Mr. Schoenbach testified.  The Hearing Officer could not have correctly interpreted the evidence and testimony any differently.  DCPS did not present *any written or testimonial evidence* to refute this fact, as would have been

necessary to meet the burden of proof under 5 D.C.M.R. § 3022.16, *Kroot* and *Mills*.  The
Hearing Officer offered no rationale for disregarding the opinions of those who know Anna best,
and for deferring to the DCPS witnesses who did not actually testify that the proposed IEP was
appropriate for her, and who could not testify about Kingsbury because they did not profess to
know anything about the program.

Since there has not been and cannot be any dispute that Anna's placement at Kingsbury
was proper, following a determination that DCPS denied her a FAPE, under *Burlington* and
*Carter*, reimbursement for that placement naturally follows.  The appropriate administrative
remedy therefore should have been to order DCPS to fund her placement there, retroactive to the
date by which the school system was required to provide her a FAPE, and continuously
thereafter.

## VIII.  CONCLUSION.

Since the Hearing Officer failed to order the appropriate remedy for defendants'
violations of the IDEA, this Court should correct his error and order reimbursement for the cost
of Anna's placement at Kingsbury for the 2002-03 school year.  Because there are no material
facts in dispute and because plaintiffs are entitled to judgment as a matter of law, plaintiffs
respectfully request that this Court enter summary judgment against defendants, reversing the
Hearing Officer's order and directing defendants to reimburse plaintiffs for the expenses incurred
in enrolling Anna at Kingsbury Day School for the 2002-03 school year, with costs and
attorneys' fees.

Respectfully submitted,

_____   /s/ (filed electronically)_____

Michael J. Eig          #912733

_/s/ (filed electronically)_
Haylie M. Iseman          #471891

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Anna Schoenbach and her parents